164 S.W.3d 149 (2005)
In the Interest of A.K.F., D.A.F., D.J.F., and K.D.F., Minors.
Kitarra Daniel James Fort, Appellant
v.
Greene County Juvenile Office, Respondent.
No. 26329.
Missouri Court of Appeals, Southern District, Division Two.
May 31, 2005.
*150 M. Elise Branyan Barker, Springfield, for appellant.
Bill Prince, Springfield, for respondent.
JOHN E. PARRISH, Presiding Judge.
Kitarra Daniel James Fort (father) appeals a judgment terminating his parental rights to A.K.F., born July 14, 1993, D.A.F., born July 8, 1995, D.J.F., born August 6, 1996, and K.D.F., born October 25, 1999. The parental rights of the children's mother, Jacqueline Denise Fort (mother), were also terminated. She appeals separately. This court affirms.
The Missouri Division of Family Services (DFS) took protective custody of the children on or about April 24, 2002. The children were removed from the custody of father and mother as a result of suspected physical abuse inflicted on A.K.F. and D.A.F.
Officer Patrick Carey of the Springfield, Missouri, Police Department was called to the Disney Elementary School because of a report of suspected child abuse. Officer Carey was accompanied by Emilie Dortch, an investigator for the Children's Division of DFS. Ms. Dortch had received a report that D.A.F. had "strangulation marks" and "bruising" on his face and shoulders.
Officer Carey, Ms. Dortch, and the school nurse met with D.A.F. and A.K.F. Officer Carey and Ms. Dortch observed marks and bruises on and around D.A.F.'s eyes, neck, chest, and chin and broken blood vessels on and around his eyes, neck, and chest. D.A.F. told the investigators that he had gotten in trouble the night before for kicking out a window in his bedroom and that father choked him "until he died." D.A.F. explained that father choked him until he could not breathe; that he fell asleep and later woke up. D.A.F. said father told him he wanted to kill him and "smacked [him] through [his] eyes."
Officer Carey and Ms. Dortch also spoke with A.K.F. She had not observed the choking incident that D.A.F. described, but she had heard D.A.F. scream and then become quiet. She told them that D.A.F. later told her he had been hurt. Officer Carey observed old bruises on A.K.F.'s temples.
A.K.F. and D.A.F. said that father would "choke slam" them. They described a "choke slam" as a wrestling maneuver where a person is grabbed by the neck and thrown down. The children stated that father would choke slam them on the bed in play and on the floor when he was angry. A.K.F. and D.A.F. said father would spank them with a baseball bat, a paddle, or belts. They said father and mother had told them not to tell others what happened in their home; that spanking would be considered child abuse. A.K.F. and D.A.F. said mother and father also hit one another.
Photographs of D.A.F.'s injuries were introduced in evidence. Officer Carey reported that based on the incidents reported by A.K.F. and D.A.F., he believed there was probable cause that father had committed one or more criminal offenses. Officer Carey signed an authorization for the children to be placed in the custody of DFS.
Father testified at the evidentiary hearing on the petition to terminate parental rights. He said he had "practiced wrestling moves" on his children in play. He *151 said the night before the date when Officer Carey and Ms. Dortch were called to the school, he had played a wrestling game with D.A.F. "in the context of [a] videogame." Father explained, "My character actually choked his character into submission where the character, as [D.A.F.] describes it, died and came back to life." Father told of an earlier incident when he held D.A.F. by the neck against a wall. He said that had not occurred near the time the officer and DFS worker had gone to the school; that it had occurred at an earlier date.
The petition to terminate father's and mother's parental rights was filed April 24, 2003, one year after the children were taken into protective custody. The petition alleged that the children had been in alternative care pursuant to an order of the juvenile court due to parental neglect and abuse. It asserted that the children had been subjected to physical abuse by father under conditions that indicated mother knew or should have known of the abuse. It also alleged that father and mother repeatedly and continuously failed, although physically and financially able, to provide the children with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the children's physical, mental, or emotional health and development. The petition asserted that the children had been under the jurisdiction of the juvenile court in excess of one year without conditions that led to the assumption of jurisdiction being rectified; that there was little likelihood these conditions would be remedied at an early date; that continuation of the parent-child relationship greatly diminished the children's prospects for early integration into a stable and permanent home.
The juvenile court found and concluded, based on clear, cogent, and convincing evidence, that the allegations contained in the petition to terminate parental rights were true and the statutory grounds for termination of the parental rights of the father and mother existed in that the minor children were abused and/or neglected, § 211.447.4(2),[1] and the children had been under the jurisdiction of the juvenile court for one year and the conditions leading to the assumption of jurisdiction remained, § 211.447.4(3). The juvenile court found it was in the best interest of the children to terminate the parental rights of father and mother, § 211.447.5. Judgment was entered terminating both parents' parental rights.
The trial court's decision to terminate parental rights will be sustained on appeal unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. [In the Interest of] S.L.J., 3 S.W.3d [902] at 907 [(Mo.App.1999)]. In our review, we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. Id. Furthermore, the standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion. [In the Matter of] C.M.B., 55 S.W.3d [889] at 893 [(Mo.App.2001)].
In re B.C.K., 103 S.W.3d 319, 322 (Mo.App. 2003). "In our review, we consider all facts and reasonable inferences therefrom in a light most favorable to the judgment below, and we will reverse `only when we firmly believe that the judgment is wrong.'" In re A.M.C., 32 S.W.3d 155, *152 158 (Mo.App.2000), quoting In re C.M.D., 18 S.W.3d 556, 560 (Mo.App.2000).
Father presents one point on appeal. He argues that the trial court erred "when it determined that the allegations contained in the petition to terminate parental rights were true and that termination was in the best interest of the juveniles in that there was insufficient evidence for the court to find that the evidence ... demonstrated that [father] had repeatedly or continuously failed, although physically or financially able, to provide the children with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for their physical, mental, or emotional health and development, and that the conditions which led to the assumption of jurisdiction still persisted, or conditions of a potentially harmful nature continued to exist so that there was little likelihood that the children could be reunited with a parent in the near future." Father claims the evidence established he "had financially supported his children to the best of his ability, had maintained employment and stable housing, had sought a psychological and psychiatric evaluation, individual counseling, psychiatric care, and participated in parenting classes to improve his parenting skills, anger management classes and H.I.T. No More classes"; that he was thereby in compliance "with the majority of the terms of the proposed treatment plan." He contends the evidence "clearly indicated that he was interested in and committed to providing his minor children with the necessary care, custody and control."
As this court perceives father's point on appeal, he does not challenge the statutory grounds the trial court found for terminating parental rights. The ground the trial court found for terminating parental rights was that D.A.F. had been adjudicated as having been abused;[2] that more than one year passed and the conditions that led to the trial court exercising its jurisdiction by taking the children into custody remained.[3]See §§ 211.447.4(2) and (3).
Arguably, father's point on appeal does challenge the trial court's determination that it would be in the best interest of the children to terminate parental rights. Whether the record supports the trial court's determination that termination of parental rights was in the best interest of the children is, therefore, the only issue for appellate review. "An appellate court reviews only issues raised in the points relied on in an appellant's brief." State v. Rogers, 973 S.W.2d 495, 498 (Mo.App. 1998). See also Villines v. Mier, 58 S.W.3d 921, 924 (Mo.App.2001).
In order for a court to terminate parental rights, it must find that at least one statutory ground for termination of parental rights exists and that termination of parental rights is in the best interest of the child who is before the court. In re K.J.K., 108 S.W.3d 62, 67-68 (Mo.App. 2003).

*153 "The determination of what is in a child's best interests is an ultimate conclusion for the trial court based on the totality of the circumstances." In re K.J.K., [supra]. It is a subjective assessment of evidence that is not reweighed by appellate review. In re K.K.J., 984 S.W.2d 548, 554 (Mo.App. 1999) .... [A]ppellate review of evidence with respect to a child's best interest is undertaken to determine if an abuse of judicial discretion occurred.
In re D.L.W., 133 S.W.3d 582, 585 (Mo. App.2004).
The factors the trial court considered in determining the best interest of the children and its evaluation of those factors included:
a. The emotional ties to the birth parents. While evidence was presented of ties between the parents and the minor children there were concerns about the health of those ties.... [D]ue to the detrimental effects the visits were having upon the child, [D.A.F.], the visits were ceased at the recommendation of the child's counselor. Upon report of counselor, the child's behaviors improved upon the cessation of visitation. One child, [A.K.F.], was described as parentified, a condition described as when a child acts in a very adult-like manner, due to the responsibilities placed upon her within the parental home. [D.J.F.] was described a[sic] child with minimal attachment to his parents[.] He presented as co-dependent, someone who felt responsible for the feelings of others rather than his own feelings. The child [K.D.F.] was described as being more bonded to her caseworker than to her mother.
b. The extent to which the parent maintained regular visitation or other contact with the minor child. The father was not allowed contact with the minor children due to a no contact provision of his bond stemming from his pending criminal charges related to the abuse to [D.A.F.]. The mother initially was inconsistent in visits, but subsequently began to visit on a more regular basis. Visits between the mother and the children took place after a point in a therapeutic setting. Visits between the mother and [D.A.F.] were suspended altogether in fall of 2002, due to the adverse effects the visits were having on the child, including acting out behaviors at school and home. Those behaviors subsided upon visitation being suspended.
c. The extent of payment by parent for the cost of care and maintenance of the minor child, when financially able to do so, including the time that the minor child was in the custody of [DFS] or other child-placing agency. There mother provided in-kind items of support. Financial support was ordered and the mother has been having those sums withheld from her paycheck. There was no evidence presented that the father provided regular in-kind or financial support.
d. Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the children to the parents within an ascertainable period of time. The Children's Division workers all testified as to the nature and extent of the services offered and worker Adams testified that she believed all of such services had been offered to the parents. Based upon the testimony of the parents and specifically their continuing denial of abuse, the *154 Court finds that even if additional services existed, there is little likelihood that they would enable a return of the children to the parents. As previously found herein, the mother was generally resistant to services and the father did not attempt to take advantage of services until the [sic] after the termination of parental rights petition was filed.
e. Based upon their unwillingness to acknowledge the abuse and their continuing lack of insight into why the children were initially placed in and remained in foster care, the father and the mother have shown a disinterest in and a lack of commitment to the minor children.
The trial court concluded that it would be in the best interest of each of the minor children to terminate parental rights of father and mother.
The trial court's findings were consistent with testimony of two social workers, two alternative care workers, a clinical psychologist, and a DFS investigator who had worked with the children and with father and mother. This court finds no abuse of judicial discretion in the trial court's determination that termination of father's parental rights was in the best interest of the children. The judgment is affirmed.
BATES, C.J., and BARNEY, J., concur.
NOTES
[1] References to statutes are to RSMo 2000 unless stated otherwise.
[2] "Termination of parental rights can be based upon acts of abuse committed, `toward the child or any child in the family by the parent.' § 211.447.2(2)(c), RSMo 1986." In Interest of P.M., 801 S.W.2d 773, 776 (Mo. App.1991). (Corresponding language to § 211.447.2(2)(c), RSMo 1986, appears at § 211.447.4(2)(c) in RSMo 2000.) P.M. suggests that D.G.N. v. S.M., 691 S.W.2d 909, 912 (Mo. banc 1985), best states the reason for allowing termination to proceed based on abuse of a sibling. D.G.N. explains, "We do not believe that the actual physical harm must be present. `To require [the] child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law.'" Id., quoting In Interest of J.A.J., 652 S.W.2d 745, 749 (Mo.App.1983).
[3] For a similar case, see In Interest of T.H., 980 S.W.2d 608 (Mo.App.1998).